UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AZHAR YOUSIF KAROUMI and
AIAAD YOUSIF KAROUME,

        Plaintiffs,                             Case Number 04-10306-BC
                                                       Honorable David M. Lawson

v.

TJ MAXX, an assumed name of
TJX COMPANIES, INC.,

        Defendant.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The defendant has moved for a summary judgment of dismissal of the claims in the plaintiffs' complaint, all of which arise under state law. The plaintiffs were arrested for shoplifting while shopping at the defendant's store in Saginaw, Michigan. They allege in their two-count complaint that their arrests were motivated by their Iraqi origin, and they seek damages for discrimination. However, although the defendant's motion has been pending for over eight weeks, the plaintiffs have not responded to it or contested the defendant's argument that the undisputed facts require judgment in its favor. The motion is scheduled for oral argument tomorrow, but the Court has reviewed the defendant's submissions, finds that the relevant law and facts have been set forth in the motion papers, and concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(e)(2). The Court finds that the evidence as presented does not create a genuine issue of material fact requiring a trial on either of the plaintiff's claims, and the Court, therefore, will grant the defendant's motion for summary judgment.

I.

The plaintiffs in this case are Azhar Yousif Karoumi and Aiaad Yousif Karoume. They were born in Iraq. Karoumi, who moved to the United States sometime in 1988, is a naturalized United States citizen. Karoume, her brother-in-law, is not. Both speak Chaldean.

On October 3, 2001, the two went shopping at defendant TJ Maxx's retail store in Saginaw, Michigan. Bridget Murphy, a loss prevention officer employed with the defendant, observed Karoumi and Karoume while they were in the store. Murphy recognized Karoumi from previous visits to the store, and she suspected Karoumi of stealing by switching price tags on various items on those occasions, but she never before was able to catch her at it. On October 3, Murphy saw the two separate; Karoume went to the men's department and Karoumi shopped in various parts of the store. Murphy "kept a close watch on Karoumi, and observed as she selected four items and moved toward the fitting room." Def.'s Mot. Summ. J. Ex. A, Murphy aff. at ¶ 4.

At this point, Murphy contacted her supervisor, Peggy Cripps, to request permission to stop the plaintiffs if they attempted to switch the prices. *Id.* at ¶ 5. Murphy states that she also informed the store manager, Theresa Schwab, of her suspicions. Murphy described the ensuing events in her affidavit as follows:

> Then I contacted Ellen Propp, the fitting room attendant. I instructed Propp to note the items Karoumi took into the fitting room, as well as the price of each item.
>
> Propp reported to me that the items Karoumi selected were two suits priced at $79.99 each and a purple outfit priced at $39.99. Propp also reported that when Karoumi emerged from the fitting room the price tag was missing from the purple outfit.
>
> I continued to watch Karoumi when she left the fitting room and joined Karoume in the men's department. I was stationed in a hidden tower and equipped with binoculars.

I observed Karoumi and Karoume remove the price tag from the $79.99 suit and replace it with a tag that Karoumi took from her pocket.

I notified the cashier, Angela VanWormer, to note the price at which the suit rang up and, if it was different from it $79.99 price, to signal me by scratching her head.

When Karoumi and Karoume went though the checkout lane, the suit Karoumi had chosen rang up as $39.99. VanWormer signaled me.

Karoumi and Karoume paid and began to walk out of the store. I intercepted them and asked them to accompany me to the loss prevention office.

There, I inspected each of the items purchased by the Karoumi and Karoume and discovered that four of the items listed on the sales receipt had the wrong price tags attached.

The total difference between the amount Karoume and Karoumi had paid and the amount properly due was approximately $79.78.

I determined this by noting that the black suit bore a price tag of $39.99 and by instructing Schwab to do price checks on all of the items in the shopping bag, by comparing them to identical items on the sales floor.

I left Karoume and Karoumi in the loss prevention office while I completed the required paperwork. Within approximately 45 minutes of apprehending Karoume and Karoumi, I called the police to pick them up.

Before I called the police, I ensured that all of the required paperwork and price checks were completed.

I instructed VanWormer to remain in the loss prevention office with Karoume and Karoumi until the police arrived.

When the police arrived they inspected Karoumi's and Karoume's identification, the contents of Karoumi's purse, and Karoume's person. The police led them out of the store.

I learned that they were transported to the Saginaw County jail and charged with retail fraud 3rd degree by the Saginaw County Prosecutors Office.

I did not take any of these actions because of the Plaintiffs' national origin.

I did not intend to, nor did I, discriminate against Plaintiffs because of their national origin.

*Id.* at ¶¶ 6-22. Angela VanWormer, Therese Schwab, and Emily Propp have filed affidavits that state their observations of the events, which are consistent with Murphy's rendition.

The defendant also filed Aiaad Karoume's deposition transcript as part of the motion papers. He testified as follows:

> Q. What you remember, right. . . .
> A. Sure. We went, me and my sister, to T.J. Maxx. So she said, "You go to the men [sic] department and I go to women [sic]. And when you done [sic], I meet you over there," because we was [sic] kind of in a hurry. So I went over there to my men [sic] department, and I started looking for and trying to find my stuff, like pants, or whatever is nice and fit [sic] me. So like later on, I say like 20 minutes, 25 minutes, she came out to me. She go some clothes on [sic] her hand, and she got baby outfit.
>
> She was like, "Look at this how cute it is." I was like, "Yeah, it's nice." She was like "You done shopping?" I was like "No, I'm not finding my regular size. I found [a] few things. I'm trying to find more stuff."
>
> So she was like, "Let me help you so this way we can get done faster." So she found me pants, my size. Was – I believe it was Levi's. I don't remember. Anyway, so I took it, I went to the – to change clothes. I tried over there. I just got one item with me and I came back.
>
> And she was keep [sic] looking through my – looking to [sic] other stuff, because she can't find my size. And then she was like, "What else do you need?" So I went over there. I bought some – some socks and underwear, something like that.
>
> And then I was like, "I want some belts, too." So we was [sic] looking at them. And the price, I don't know, you were saying $7.99, I believe actually the price was $5.99, something like that.
>
> So since it was that cheap, I took one for me and like present for my dad . . . .So I tried on me the belt. So it didn't fit me, so I put it back and I try on [an]other one. I try like three times, put belt on me, and then it fit me good.
>
> And then I took one . . . kind of bigger than me, close to my dad's size. And I put it in the shopping cart. And then she was like, "You all set?" And I said, "Yeah, I'm all set." And so we go to the cash register. And we went over there. So like she said, we were in the line and they opened the other register. They was like, "You guys come over here," so we went to the other register. And then she started ringing up the stuff. And then [sic] wasn't going through." I told Anna. She was like, "Well, can you – do you want me to bring other suff like that, you know? Maybe same problem." And she said, "Yeah, it would nice of you if you do that."

-4-

> So Anna, she went right away and she bring the stuff. And she scanned it, the lady. And [it] was working. And then she paid for all the stuff. She got [a] receipt." I got a bag and she got a receipt and I went outside. And Anna, she was behind me.
>
> And then that lady, she was like, "Stop." And I was like, "Huh?" She was like, "You, you. I want you guys with me." So I was kind of [a] little bit shocked. Something [sic] mistake happened. I don't know what is it.

Def.'s Mot. Summ. J. Ex. E, Karoume dep. at 11-14.

Karoumi recalled similar events at her deposition. She stated that she and Karoume entered the Saginaw store and separated: she went to the women's department and he to the men's. Karoumi was looking for an outfit and saw "three of them that I liked so I grabbed the three, and went to the dressing room." Def.'s Mot. Summ. J. Ex. E., Karoumi dep. at 21. Of the three outfits, "one of them fit nice; the other two, left them with the lady at the fitting room, where she gives you a number." *Ibid.*

According to Karoumi, she then went to the children's department, where she saw "some stuff for my kids," specifically, an outfit for her infant. *Ibid.* After that, she made her way to the junior's department and "grabbed a pair of pants." *Ibid.* Finished with her shopping, Karoumi testified that she proceeded to the men's department to help her brother-in-law. There, she helped Karoume find pants because "you really got to dig in there" to find the correct size. Karoumi indicated that she wanted to "hurry up and finish so we could leave." *Id.* at 22. Karoume found and tried on a pair of pants he liked and began looking for belts. He tried on several belts, "he liked one. Another he grabbed for his father." *Ibid.*

The two proceeded to the cash register to check out. *Ibid.* Karoumi described the following:

A. The whole time we were there, we were speaking our language, because he was new to the county. He had just been here not even a year . . . .

> At the time we went to check out, so[me] lady was in – another register had just opened up, said she would help us over here. We went to that line.
>
> Q.  Uh-huh.
> A.  She was ringing us up. As she was ringing us up, one item did not ring up. The tag was on it and everything. It was a dress. It was from a clearance rack.
>
> The lady was like, "Well, I don't know what is going on. This is not scanning." It was she was like three, four times she was trying to scan it. I told her exactly where they were, if she wanted me to grab one for her. She said, "Oh, that would be nice of you." I said, "No problem." So I went and grabbed that same identical item, and it scanned.
>
> After that, we left. I paid for the stuff in cash, everything together, mine[] and my brother-in-law's. As we were leaving the store, the doors – he had walked out of the first door, the main door. His foot was already out, and I was right behind him. And the lady, her name is Bridget . . . approached us saying "Both of you guys, I want you guys in the office," you know.

*Id.* at 23-24.

Karoumi testified that she and Karoume followed Murphy to the office, but that Murphy refused to tell them the reason for the trip. According to Karoumi, Murphy spoke to them with "total[ ] attitude." *Ibid.* Karoumi told Murphy that Murphy was "making a big mistake" and asked that Murphy first call the police. *Ibid.* In response, Murphy stated that she wanted to speak with Karoumi and Karoume in the office.

Karoumi related that once in the office, the door was locked. Present in the office were "the lady from the changing room, she was there, and this other man. We don't know who the other guy was[.]" *Ibid.* Karoumi and Karoume were told to have a seat. Karoumi again asked why they were in the office and reiterated her belief that Murphy was "making a big mistake." *Id.* at 25. Murphy then asked Karoumi for her bag and receipt.

> A.  . . . So she took my bag and my receipt. And she's going through the items, looking for the receipt, you know.

> > Then she called somebody, the cashier from the outside. The lady came. She took my bag and my receipt and went outside. I said, "What are you taking my bag for and my receipt for?" She just didn't say nothing [sic], just completely ignored us." Left for like 10, 15 minutes, easy.
>
> Q. Hold on a second. Okay. Go on.
> A. As I was there, also, I told her to call the police and she would not – at this time she still did not call the police.
> Q. Uh-huh.
> A. She left with the items, her and the cashier, the one that ringed [sic] us up, my items and my receipt. She comes back . . . saying – she brought me identical [sic] item, identical outfit like the outfit had, it was a pants suit, saying this item was like $69.99 or $59.99, I'm not sure exactly, but the one I purchased was $39.99, that the price was switched.
> > She made a statement saying that before I entered the dressing room, it was this item; and when I left the dressing room it was this item . . . . And I told her, "Ma'am, what do you think, I have a machine gun or something like that to do it, you know, do I have a machine that I can switch the tags or something?" I said, "This was the price on it, ma'am." She goes "Nope."

*Id.* at 25-26.

Murphy then left the office and returned after ten minutes. Murphy took issue with the price of the pants Karoumi purchased. Karoumi explained that she "got that pants from a clearance rack. I had just went through it. It wasn't even for me, the pants. I had got it for my niece." *Ibid.* Karoumi testified that she asked Murphy whether there was a master price list against which they could check the items. Apparently, Murphy stated "I don't have to show you anything." *Id.* at 26-27.

Murphy also accused Karoumi and Karoume of switching the prices on the belts Karoume had tried on and purchased. Karoumi stated that they were on the clearance rack and that Murphy was mistaken. Karoumi repeated her request to see a price list; Murphy again refused. At this point, Murphy called the police and confiscated Karoumi's identification. Karoume apparently had left his card in the car.

Karoumi said that she explained to Karoume what was happening in Chaldean because Karoume's English was basic. Thereafter, the police arrived. According to Karoumi, the police spoke to Murphy for fifteen or twenty minutes outside the office. The officers searched the plaintiffs and transported them to the Saginaw County jail. They were charged with misdemeanor third-degree retail fraud. The plaintiffs were held at the jail for three hours. On August 30, 2002, the plaintiffs were found not guilty following a jury trial. The defendant never returned the purchased items and presently the plaintiffs are banned from shopping at any TJ Maxx store.

At her deposition, Karoumi testified that she believed the reason she was taken to the office and accused of price switching by Murphy was because of her national origin:

> Q. Okay. In your complaint, you allege that the reason you were stopped by TJ MAXX is because of your national origin; is that right?
> A. Yeah.
> . . .
> Q. Okay. Is it fair to say that you believe that because you didn't do anything wrong?
> A. Plus one more thing. My brother-in-law was like trying belts on, so I thought maybe she thought that he stole the belt, but he didn't buy the belt, too.
> Q. Okay.
> A. So I'm not exactly sure, you know.
> Q. Okay.
> A. But we were speaking our language, and this was like right after September 11th. And there was a lot of, you know, fear. And people were upset, you know. And I understand it, you know.
> Q. Yeah.
> A. And for me being [in a] different country, you know, and I – you know. This is what it was, I guess. We didn't do anything wrong, you know?
> Q. Okay. So it is fair to say that because you didn't do anything wrong, and because of what occurred on September 11th, which wasn't even a month before that, you thought probably the reason you were stopped was because of your national origin; is that fair to say?
> A. Yes.
> Q. Is there any other reason that you believe the real reason you were stopped was because of your national origin.
> A. Well, I couldn't think of any other reason.

*Id.* at 84-85.

>Karoume testified similarly:
>
>Q. And its fair to say that you believe the reason that you were picked out and brought back to the office in the first place was a result of your national origin, is because you hadn't done anything wrong, right?
>A. Right. Right.
>Q. Is there any other reason, other than the fact you that you obviously hadn't done anything wrong, that you believe you were taken back to the office?
>A. Can you repeat that question please?
>
>. . .
>
>Q. The gist of this case . . . is that you believe you were treated unfairly.
>A. Yes.
>Q. That you were falsely imprisoned or arrested, or whatever it might be, because you're Chaldean. Do you understand that?
>A. Yes. Yes.
>Q. And is it fair to say that you believe that it was unjust and unfair because you are Chaldean, and you didn't do anything wrong?
>A. Yes.
>Q. All right. Is there anything other than that that you're relying upon for the fact that you believe you were unfairly treated or discriminated against?
>A. Yes.
>Q. What? Oh. Anything else or no?
>A. This, and plus maybe I believe when the police officer, he was searching me, he was making me take my shirt off –
>Q. Right.
>A. I believe prejudice. She told him, "He steel something," because when I was put [sic] the belt on me, trying them, maybe she thought that I was stealing something, I hide something over there. So that's the reason he made me – for second time he came [sic] searched me, because I got searched . . . for the first time [by] the young guy.
>
>. . .
>Q. So you think maybe she said you somehow –
>A. Yeah.
>Q. With these mirrors, or whatever it was, putting belts on and therefore thought maybe you were stealing belts?
>A. Yes. She thought that, too. Plus, like you said, yeah, they [were] prejudice.

Karoume dep. at 28 - 30.

On October 1, 2004, the plaintiffs filed a two-count complaint in the Saginaw County, Michigan circuit court alleging violation of Michigan's Public Accommodation Act, Mich. Comp. Laws § 750.147, and the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.* The defendant removed the action to federal court on October 29, 2004 based on diversity jurisdiction. The defendant filed a motion for summary judgment on October 13, 2005, to which the plaintiffs failed to respond. The Court sent a notice to the parties setting the motion for hearing on December 13, 2005, but, as noted above, the hearing is no longer necessary.

II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential

element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

The procedural burdens described above rarely can be met by the non-moving party's failure to respond to a summary judgment motion. There is "no duty imposed upon the trial court to search the entire record to establish that it is bereft of a genuine issue of material fact." *Guarino v. Brookfield Tp. Trustees*, 980 F.2d 399, 404 (6th Cir 1992) (quoting *Street*, 886 F.2d at 1480). Although silence in the face of a summary judgment motion does not constitute abandonment or a claim or defense as such, it amounts to a failure to fulfill the obligation to "designate" the "specific facts showing there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. That failure is indulged at the mute party's peril: "This burden to respond is really an opportunity to assist the court in understanding the facts. But if the non-moving party fails to discharge that burden – for example, by remaining silent – its opportunity is waived and its case wagered. *Guarino*, 980 F.2d at 405.

Section 302 of Michigan's Elliot Larsen Civil Rights Act provides that "a person shall not . . . [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of . . . national origin." Mich. Comp. Laws § 37.2302. A place of public accommodation, as that term is used in the Act, is defined as "a business. . . whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." *Clarke v. K Mart Corp.*, 197 Mich. App. 541, 544, 495 N.W.2d 820, 822 (1992) (citations omitted).

The Michigan Court of Appeals has held that a plaintiff bringing an action under section 302 need not show an actual denial of goods or services. Rather, "a violation of § 302(a) occurs where a person is denied full and equal enjoyment of the goods, services, facilities . . . provided by the defendant." *Id*. at 545, 495 N.W.2d at 822 (internal citations and quotation marks omitted). Analysis under section 302 tracks both federal law and other claims under the Elliot Larsen Civil Rights Act:

> We believe that the appropriate test is the same as that used under other sections of the Civil Rights Act. Plaintiff must first show either disparate treatment or intentional discrimination; if the plaintiff does so, defendant must establish a legitimate reason for its actions; if the defendant does so, plaintiff must then show that the reasons proffered are mere pretext by showing that they lack credibility or that a discriminatory motive was a more likely reason for the action.

*Ibid.* (citing *Rasheed v. Chrysler Motor Corp*., 196 Mich. App. 196, 493 N.W.2d 104 (1992), *rev'd on other grounds*, 445 Mich. 109, 517 N.W.2d 19 (1994)).

Thus, claims under section 302 involving circumstantial evidence follow the *McDonnell Douglas* burden-shifting framework. A *prima facie* case is established when a plaintiff "show[s] that she was a member of a protected class, that she was discriminated against at a place of public accommodation, that the defendant was predisposed to discriminate against persons in the class, and that the defendant acted upon that disposition when the discrimination occurred." *Schellenberg v. Rochester Michigan Lodge No. 2225, of Benev. and Protective Order of Elks of the United States of Am.*, 228 Mich. App. 20, 33, 577 N.W.2d 163, 169 (1998). If a plaintiff successfully establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Meager v. Wayne State Univ.*, 222 Mich. App. 700, 711-712, 565 N.W.2d 401, 410 (1997). Once a defendant articulates such a reason, the burden of

production again shifts to the plaintiff to demonstrate that the proffered reasons for the action were a pretext for unlawful discrimination. *Ibid.*

Similarly, the Public Accommodations Act prohibits denying individuals equal access to, among other things, shopping at retail establishments. The statute reads:

> Any person being an owner, lessee, proprietor, manager, superintendent, agent or employee of any such place who shall directly or indirectly refuse, withhold from or deny to any person any of the accommodations, advantages, facilities and privileges thereof . . . on account of . . . national origin, . . . or that any particular . . . national origin . . . is not welcome, objectionable or not acceptable, not desired or solicited, shall for every such offense be deemed guilty of a misdemeanor[;] . . . and every person being an owner, lessee, proprietor, manager, superintendent, agent or employee of any such place, and who violates any of the provisions of this section, shall be liable to the injured party, in treble damages sustained, to be recovered in a civil action.

Mich. Comp. Laws § 750.147. The Public Accommodations Act, unlike the Elliot Larsen Civil Rights Act, generally requires proof of actual denial – for an illegal reason – of the right to shop in a retail establishment. *Clarke*, 197 Mich. App. at 546, 495 N.W.2d at 822 (holding that "[b]ecause plaintiff does not claim a refusal or denial of the privilege of shopping at defendant's store, we agree that she has failed to state a claim under this act").

In this case, the record presented does not establish that the defendant was aware of the plaintiffs' national origin. The record demonstrates – at least as it exists without a response from the plaintiffs – that only after the plaintiffs were stopped and brought to the back office did Murphy find out that the plaintiffs were from Iraq. *See* Karoumi dep. at 29. Apparently, the plaintiffs were asked not to speak in Chaldean by Murphy. *Ibid.* (claiming that Murphy said "[w]ell, no, he looks like he speaks good English to me, you know. Speak English"); Karoumi dep. at 24 (alleging that Murphy "denied me [sic] speak my language"). However, there is no indication that Murphy asked them to speak in English for reasons other than to understand what the plaintiffs were saying.

Karoumi seems to acknowledge as much in her deposition. Karoumi dep at 29 (stating "[s]o I told my brother-in-law . . . 'Just leave her alone. We don't want them to think that we're talking about them or anything' because they couldn't understand our language").

Further, there is no indication that the defendant had a predisposition to discriminate against those of Iraqi national origin, or any national origin for that matter. Without such evidence, it is not possible to infer that the defendant's actions were illegally motivated; there is no direct evidence of a discriminatory purpose. Thus, the elements of a *prima facie* case of discrimination under section 302 have not been met.

But even if the record demonstrated a *prima facie* case, there is no evidence in the record to suggest that the defendant's proffered reason for stopping the plaintiffs and bringing them to the office was anything other than misguided. To be sure, the plaintiffs were found not guilty of retail fraud. However, it does not follow that the defendant's suspicion of shoplifting was a guise for discrimination; Murphy simply was wrong.

The plaintiffs claim under the Public Accommodation Act also fails. Although the plaintiffs have been "banned" from shopping at TJ Maxx stores, there is no evidence that the defendant's decision was motivated by the plaintiffs' national origin. Rather, the record demonstrates at most that they were told not shop at the stores because of a misbegotten belief originated by a clumsy store detective that the plaintiffs were shoplifting. By their silence, the plaintiffs have failed to designate facts in the record that support any other inference.

III.

The Court's review of the record does not turn up any facts creating a triable issue on either of the plaintiffs' two counts. The Court believes, therefore, that the defendant is entitled to a judgment in its favor as a matter of law.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt # 22] is **GRANTED.**

It is further **ORDERED** that the complaint is **DISMISSED** with prejudice.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: December 12, 2005

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 12, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS